IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Citizens for Tax Reform, *et al.*, | : | |
| | : | Case No. 1:05-CV-212 |
| Plaintiffs, | : | |
| v. | : | District Judge Susan J. Dlott |
| | : | |
| Joseph T. Deters, *et al.*, | : | ORDER |
| | : | |
| Defendants. | : | |

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (doc. 29), the State of Ohio's Motion for Summary Judgment (doc. 33), Defendant Joseph T. Deters' Motion for Summary Judgment (doc. 32), and Defendant Mathias H. Heck, Jr.'s Motion for Summary Judgment (doc. 34). For the reasons that follow, Plaintiffs' Motion, Deters' Motion, and Heck's Motion are **GRANTED**, and the State of Ohio's Motion is **DENIED**.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

Ohio Revised Code ("O.R.C.") § 3599.111 ("the Statute") states in relevant part as follows:

> (B) No person shall receive compensation on a fee per signature or fee per volume basis for circulating any declaration of candidacy, nominating petition, initiative petition, referendum petition, recall petition, or any other election-related petition that is filed with or transmitted to a board of elections, the office of the secretary of state, or other appropriate public office. * * *
>
> (D) No person shall pay any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked.

O.R.C. § 3599.111.

Plaintiffs Citizens for Tax Reform ("CTR") and Jeffrey P. Ledbetter, a former Treasurer of CTR, filed a Verified Complaint on April 1, 2005 challenging the constitutionality of the

1

O.R.C. § 3599.111 on the grounds that the prohibition of payment to petition circulators on a per-signature or per-volume basis violated their core political speech rights. (Doc. 1.) Plaintiffs named as defendants Joseph T. Deters, the Hamilton County, Ohio prosecutor, and Mathias H. Heck, Jr., the Montgomery County, Ohio prosecutor, both in their official capacities only, as persons responsible for the enforcement of the Statute. (Id.)

Prior to the effective date of the Statute, CTR had engaged a political consulting firm on the basis of a fixed fee contract to secure the necessary signatures to qualify a proposed constitutional amendment for the November 2005 Ohio general election. Pursuant to the contract, CTR was to pay the firm $1.70 per signature for a total of approximately 450,000 signatures. After the Statute became effective, CTR was not permitted to pay circulators on a per-signature or on any per-volume basis. The political consulting firm was no longer willing to collect signatures pursuant to the agreed-upon fixed-fee contract and it estimated that the cost for gathering the signatures would increase by more than $300,000. Plaintiffs asserted that the Statute increased the cost of qualifying their proposed amendment, made it more difficult to raise money necessary to fund the initiative effort, and that they had refrained from attempting to qualify the proposed amendment for the ballot so long as the Statute was in force. (Id.)

The Ohio Attorney General moved to intervene as a defendant in this action on March 11, 2005 in order to defend the constitutionality of § 3599.111 and the Court issued a Notation Order permitting the intervention on March 12, 2005. (Doc. 7.)

On March 19, 2005, Chief Judge Sandra Beckwith issued a Temporary Restraining Order enjoining the enforcement of O.R.C. § 3599.111. (Doc. 16.) Chief Judge Beckwith found that Plaintiffs "have introduced actual evidence that tends to show that the restriction on payment of

petition circulators on a per-signature basis limits their ability to retain effective circulators and reduces the likelihood that they will succeed in placing their initiative on the November 2005 ballot." (Id. at 9.) She further found that the State of Ohio did not adduce evidence of the necessity of the law to prevent fraud. She stated that the State's evidence that fraud occurred when circulators were paid on a per-signature basis in Ohio was not sufficient to establish that the per-signature basis was cause of or an incentive to the fraud. (Id.) The State had not proven "that compensation on a per-signature basis generates fraud at a greater rate than other forms of compensation." (Id.)

On May 4, 2005, March 22, 2006, and April 16, 2006, the Court issued Agreed Orders extending the temporary restraining order until October 15, 2005,[1] extending it to cover the amendments to the law that took effect on May 2, 2005,[2] and extending it pending a final disposition in this case. (Docs. 20, 42, 46.)

## II.     ANALYSIS

### A.     Defendants Deters' and Heck's Motions for Summary Judgment

Defendants Deters and Heck move for summary judgment on the basis that the State of Ohio has intervened to defend the State of Ohio Statute. Defendants also admit that they will be bound by an adverse ruling against the State of Ohio as to the validity of the Statute. Plaintiffs have presented no argument or evidence suggesting that the county prosecutors are necessary to

---

[1] The Court originally issued a Temporary Restraining Order and then extended that TRO. For reasons not clear in the record, the TRO is referred to as a preliminary injunction in CM/ECF document numbers 42 and 46.

[2] The amendments primarily concerned the punitive provisions of the law and are not relevant to the constitutional issues before the Court.

a complete and final adjudication of this matter.  Accordingly, Deters' and Heck's Motions for Summary Judgment are **GRANTED**.

**B.      Plaintiffs' and the State of Ohio's Cross-Motions for Summary Judgment**

Plaintiffs have moved for summary judgment seeking a declaration that the Statute is unconstitutional and an order enjoining enforcement of the Statute.  The State of Ohio has filed a cross-motion for summary judgment.

"Petition circulation is core political speech because it involves interactive communication concerning political change."  Buckley v. American Const. Law Found., Inc., 525 U.S. 182, 186 (1999) (citation omitted).  It "involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  Meyer v. Grant, 486 U.S. 414, 421 (1988).  Petition circulators must convince the signators that the subject matter of the petition "is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate."  Id.

Analysis of the particular restriction at hand, the prohibition of a per-signature payment scheme, must first begin with the recognition that the Ohio General Assembly could not have acted to prohibit all forms of payment to petition circulators.  The United States Supreme Court declared in 1988 that a Colorado statute that prohibited payment to petition circulators was an infringement of rights of political speech guaranteed by the First Amendment.  Id. at 422-24. The Court held that the prohibition restricted core political speech because it "limits the number of voices who will convey [the political] message and the hours they can speak and, therefore, limits the size of the audience they can reach" and second it "makes it less likely that [the proponents of the amendment] will garner the number of signatures necessary to place the matter

4

on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." Id. at 423.

The Supreme Court stated that petition/initiative proponents had a "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." Id. at 424. The Court considered the State of Colorado's expressed justifications for the restriction of a protected right, including the protection of the integrity of the initiative process. Id. at 425. The Court concluded, however, that Colorado had "failed to demonstrate that it is necessary to burden [the amendment proponents'] ability to communicate their message in order to meet its concerns." Id. at 426. The Supreme Court noted the State of Colorado offered no evidence to support its theory that the prohibition was necessary to eliminate the temptation to "accept false signatures" and the Court stated that it was unprepared to assume that a "professional circulator--whose qualifications for similar future assignments may well depend on a reputation for competence and integrity--is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." Id. The Meyer Court expressed that it was persuaded by the existence of Colorado laws creating criminal penalties for forging a signature on a petition, making false or misleading statements relating to a petition, or paying someone to sign a petition. See id. at 427. The Court stated that those "provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition." Id.

Following Meyer, the Supreme Court had another opportunity to set forth the standard by which to evaluate the constitutionality of different types of election laws. The Supreme Court set forth a sliding scale test as follows:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358-59 (1997) (internal quotations and citations omitted) (deciding that a state law forbidding a single person from being listed as the candidate for more than one political party was constitutional).

Finally, the Supreme Court addressed three different conditions Colorado had placed on the ballot-initiative process by law: (1) a requirement that petition circulators be registered voters; (2) a requirement that circulators wear an identification badge; and (3) a requirement that initiative proponents report the name and address of all paid circulators and the amount paid to each circulator. Buckley, 525 U.S. at 186. After stating that petition circulation is core political speech, the Supreme Court explained that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'" Id. at 192. The Court cited Timmons and then reviewed each restriction. It did not however, specify whether each restriction was a severe burden on speech necessitating strict scrutiny or a lesser burden justifiable by a reasonable, nondiscriminatory reason. See id. at 193; id. at 206 (Thomas, J. concurring). The Court ultimately struck down each of the three restrictions. It found as to the registered voter requirement and the name badge requirement that both discouraged participation in the petition circulation process, which limited the number of voices who could carry the petitioner's message

and cut down the size of the audience they could reach, and found that Colorado failed to justify that burden. Id. at 194-95, 200.

Based on these Supreme Court precedents, the Court must determine whether the Statute burdens First Amendment rights and whether the State's interest in preventing fraud justifies the burden on speech. The State contends that the Statute is only a lesser burden on speech subject to less exacting review under Timmons. Plaintiffs, on the other hand, contend that the Statute is a burden on core political rights under Meyer and that the Statute should be subject to strict scrutiny analysis.

The Court finds that Plaintiffs have established with evidence that the Ohio Statute burdens their core political speech rights. As Chief Judge Beckwith found in Temporary Restraining Order, Plaintiffs have introduced actual evidence that tends to show that the Statute limits their ability to retain effective circulators and reduces the likelihood that petition proponents will be able to place their petitions on the ballot. For example, prior to the enactment of the Statute, CTR retained Arno Political Consulting ("Arno PC") to obtain 450,000 signatures to place the so-called "TEL Amendment" on the ballot at the cost of $1.70 per signature for a total of $765,000. CTR had determined, based on its work on a previous ballot initiative, that it would not be able to gather the number of necessary signatures without engaging professional circulators. After the Statute was passed, Arno PC indicated that it would have to be paid on a "time and materials" basis, requiring a monthly management fee of $45,000 plus costs, and estimated that its total fee would exceed $1 Million. Plaintiff Ledbetter stated in his affidavit that CTR would not have been able hire Arno PC on a time and materials contract, and thus would not have been able to pursue its goal of placing the TEL Amendment on the ballot, if the

7

Statute had not been enjoined in this litigation. In fact, CTR eventually paid Arno PC $846,346.70 for the collection of 497,851 signatures pursuant to the fixed-price contract. With the benefit of hindsight, and believing that it would have had to hire employee supervisors to manage circulators who worked in the more rural counties in Ohio, Arno PC would have charged CTR approximately $1.5 Million to collect the signatures on a cost and materials basis.

Likewise, Lee Albright, the President of National Petition Management, another consulting firm who has successfully qualified four measures for the ballot in Ohio prior to enactment of the Statute, estimated that it would cost 60% more to qualify ballot measures in Ohio if the Statute was enforced. Additionally, Michael Arno, President of Arno PC, stated that his firm had difficulty hiring the more experienced and trustworthy circulators to work in the State of Oregon after it prohibited per-signature payments, and he believed the same problem would arise in Ohio if the Statute is enforced. Arno also stated his opinion that circulators paid per-signature "are much more careful and diligent about collecting signatures [than circulators paid by time worked] in part because circulators are 'selling' each signature . . . and [political consulting firms] will not 'buy' a signature it deems questionable." (Arno Decl. ¶ 33.) Tracy Taylor, who runs Taylor Petition Management, a mid-level firm that recruits and hires the circulators, testified that firms can control quality better under a per-signature payment scheme because they only pay circulators for signatures that appear to be valid. Taylor has worked under both the per-signature payment schemes and time-based payment schemes and testified that qualifying initiatives took more time and cost more money under the time-based schemes. Taylor also testified that he had trouble retaining the top coordinators who had worked on prior Ohio initiatives to work on the TEL Amendment because of the hourly pay system in place

8

before the Statute was enjoined.

Gena Ranger supports Arno's and Taylor's testimony. Ranger states in her declaration that she is a professional circulator who has worked in more than a dozen states and has worked in Ohio for five statewide petition efforts in 2003, 2004 and 2005. Ranger refused a request by Taylor Petition Management to participate in a petition drive in Ohio in 2005 after being told she would be paid by the hour. She also refuses to participate in petition drives in Oregon (where she had previously worked before a per-signature prohibition was passed) or in other states where per-signature payment is prohibited. She stated that she believes she can make more money "being paid on a per-signature basis working on petition efforts in states that do not prohibit per-signature payment."

The State challenges the Plaintiffs' evidence delineated above as proving at most a financial disincentive, not a political speech impediment. The State also asserts that the experience in Oregon after Oregon prohibited per-signature payments to circulators, establishes that such laws impose only a lesser burden on speech. Certified results from the Secretary of State of Oregon demonstrate that seven election measures qualified for the ballot in Oregon in 2002, before Oregon prohibited per-signature payments, and six measures qualified in 2004, after the prohibition was passed. Moreover, the signature validity rate increased from 67.92% in 2002 to 72.35% in 2004 after the prohibition was passed.

The Court questions the probative value of this limited data from Oregon. Without more data and without a more sophisticated analysis, the Court cannot determine whether factors apart from the change in payment scheme might have impacted the 2002 results or the 2004 results. Further, the Court questions this limited data, and to some degree questions any testimony,

equating the Oregon initiative experience to the Ohio initiative experience because it is not an apples to apples comparison.  The laws in the two states have fundamental differences.  The Ohio Statute permits payments only if made on the basis of time worked.  O.R.C. § 3599.111.  The Oregon Constitution, as revised, prohibits payments based on the number of signatures obtained.  Or. Const. Art. IV § 1b.  But this Constitutional provision has been interpreted in the Oregon Administrative Rules as not prohibiting salary raises or bonuses based on circulator's productivity, so long as the payment is not based on a per signature calculation.  Or. Admin. R. 165-014-0260.  Also, circulators in Ohio face a special challenge in that a certain percentage of total signatures must be gathered from each of one-half of the 88 counties in Ohio, which necessitates that circulators gather signatures from lesser populated counties.  Ohio Const. Art. II § 1g.  Michael Arno testified that in Oregon petition circulators focus most of their attention on the Portland area.  The Ohio county-distribution requirement would appear to make gathering signatures in Ohio a more difficult effort in the best of circumstances.

Finally, in Ohio, each signature on a part-petition, as the signature sheets are called, is verified individually by the county board of elections for the county in which the signators reside to determine if the signators are registered voters and to eliminate any potential instances of fraud.  O.R.C. § 3519.15.  In Oregon, conversely, the Secretary of State verifies the petitions using "a statistical sampling technique to verify whether a petition contains the required number of signatures of electors."  Or. Rev. Stat. 250.105(4).  It also then employs statistical sampling to select a fraction of the petition signatures to verify.  Or. Admin. R. 165-014-0110.  Thus, the likelihood of finding any instances of irregularities or fraud that might have occurred in the petitions appears to be greater in Ohio.

On the whole, Plaintiffs' evidence establishes that the Statute would burden initiative proponents in Ohio by increasing their costs, increasing the time needed to qualify ballot measures, and as a result, making it more difficult to collect signatures and place measures on the ballot.  Undoubtedly, the Statute, though not as burdensome as the complete payment prohibition struck down in Meyer, both  "limit[s] the number of voices who will convey [the political] message and the hours they can speak and, therefore, limits the size of the audience they can reach" and "mak[es] it less likely that [the proponents of the amendment] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."  Meyer, 486 U.S. at 423.

As to the State's justification for the per-signature payment prohibition, the State relies in large part upon the documented instances of irregularities or fraud that occurred in the signature collection effort to place Ralph Nader's name on the ballot for the 2004 presidential election. The Nader petition circulators were paid on the per-signature basis.  The fraud included instances where the name of the petition circulator was forged, where persons who signed off as the petition circulator did not actually circulate the petition or witness the signators' signatures, and where petition circulators misrepresented that the Nader petition was a petition related to same-sex marriage. (Doc. 9-4.)  Chief Judge Beckwith, in the Temporary Restraining Order, criticized this evidence as not proving that the method of payment was the cause of or incentive to the fraud.  This Court agrees.  The Nader evidence does not establish that the fraud would have been less likely to occur had the circulators been paid on a hourly basis.

The State also submits the affidavit of Bryan C. Williams, Director of the Summit County Board of Elections, who testified about an instance in Summit County where one petition

11

circulator who was paid per-signature had his part-petitions invalidated in toto based on numerous irregularities in the part-petitions. (Doc. 35.) A great number of the signatures on the part-petitions were determined to contain the names of persons who were not registered voters. Like the Nader petition evidence, the Williams affidavit in no way isolates the per-signature payment method as the cause of the irregularity. Other evidence submitted by the State regarding supposed fraud in Ohio similarly fails to prove that the per-payment signature method is an incentive to fraud. A criminal indictment against Kevin Eugene Dooley in Franklin County, Ohio for forging a false voter registration form proves nothing, primarily because the Court will not infer guilt from an indictment. (Doc. 37.) Interestingly, the indictment alleges that Dooley was paid both *per hour* and a fee for each new voter registered above a set goal. An indictment against and guilty plea by Chad A. Staton in Defiance County, Ohio for ten counts of false voter registration does not contain any information from which the Court could infer that Staton was paid per-signature or that such payment was the motivation for the fraud. (Doc. 39.) Finally, the Court struck as inadmissible "evidence" in the form of newspaper articles discussing possible instances of irregularities in the November 2006 election. (Doc. 58.) The newspaper articles did not support the State's argument in any event because, among other reasons, the articles did not establish that the circulators involved were paid on a per-signature basis.

The State also submits evidence related to instances of fraud in Oregon by circulators working under the per-signature payment method before Oregon passed a per-signature payment prohibition. The evidence is submitted in the form of an affidavit of John Lindback, the Director of the Election Division for the Oregon Secretary of State's office, and supporting exhibits. (Doc. 51-2.) Plaintiffs challenge the admissibility of the Lindback affidavit and exhibits on a

12

Rule 56 motion. The main point of Lindback's affidavit testimony is his belief that "per-signature payments are a significant incentive to fraud." (Doc. 51-2 ¶ 12.) He states that he bases his conclusion on his "comprehensive catalog of experience," including "substantial responsibility for investigating complaints related to initiative and referendum process and reviewing reports generated during such investigations." (Id. ¶¶ 1, 13.) He then identifies several ways that circulators perpetuated fraud when gathering signatures in Oregon and he cites to anecdotal evidence based on investigative reports and a deposition that are attached as exhibits to his affidavit.

The investigative report exhibits concern investigations conducted at the request of Lindback's office regarding suspected incidents of petition signature fraud. (Doc. 51-2.) The investigative reports and the factual findings therein are admissible under the public records and reports hearsay exception contained in Rule 803(8)(c) of the Federal Rules of Evidence. However, the numerous sections of the investigative reports that merely recount witness interviews are inadmissible as hearsay under Rule 801 of the Federal Rules of Evidence. Nowell v. City of Cincinnati, 2006 WL 2619846, at *5 (S.D. Ohio Sept. 12, 2006) (Dlott, J.); see also Chicago Ins. Co. v. Chiminee Cricket, 17 Fed. Appx. 374, 378 (6th Cir. 2001) (not admitting investigation report based on untrustworthy witness hearsay statements); but see Leary v. Livingston Cty., 2006 WL 2865213, at *5 (E.D. Mich. Oct. 5, 2006) ("The reports, and accompanying statements made by witnesses recorded in the reports, fall under this [Rule 803(8)] exception."). The difficulty here is that the investigative reports are almost devoid of factual findings, and instead contain only witness statement summaries. The Lindack affidavit also references and contains as an exhibit a small portion of a deposition transcript from an

13

Oregon case. That deposition is not admissible for the truth of the matters asserted therein in this case.

The Court finds that the Lindback affidavit, and the exhibits attached thereto, are not probative of the issue before the Court even to the extent they are admissible. The affidavit and exhibits would tend to establish that certain circulators in Oregon who were paid on a per-signature basis or a productivity basis submitted numerous false signatures. However, as discussed above, stark differences exist between the Ohio initiative process and the Oregon initiative process. The Court will not extrapolate that the per-signature payment method is an incentive to fraud in Ohio, whereas an hourly payment system would discourage fraud in Ohio, based on instances of apparent fraud occurring in a different state where signatures are verified using a statistical sampling method.

In sum, the Court finds that the State has not submitted evidence that the per-signature payment method is such an incentive to fraud that would justify the burden the Statute places on initiative proponents' core political speech rights. The Court's decision is informed by a growing body of jurisprudence examining similar per-signature payment prohibitions enacted in other states. In earlier district court cases striking down laws that prohibited per-signature payment, a common theme was the defendants' failure to provide evidence that the per-signature method of payment caused actual fraud.

A district court analyzing a Washingon law framed the issue as follows: "Unless there is some proof of fraud or actual threat to citizens' confidence in government which would provide a compelling justification, the right of public discussion of issues may not be infringed by laws restricting expenditures on referenda and initiative campaigns." LIMIT v. Maleng, 874 F.Supp.

1138, 1141 (W.D. Wash. 1994).  The defendants conceded that they had no actual proof of fraud stemming from the payment of per-signature method of collection.  Id. at 1140.  The court held that the Washington law was unconstitutional.  Id. at 1140-41.

In Mississippi, the plaintiffs challenging a law prohibiting per-signature and per-petition payment schemes established that the law burdened political expression, including with evidence that circulators paid a flat daily rate collected "far fewer" signatures than those paid per-signature and that some circulators would only work on a per-signature basis.  See Term Limits Leadership Council v. Clark, 984 F.Supp. 470, 471-73 (S.D. Miss. 1997).  Conversely, the defendants offered only speculation, not direct evidence, that circulators paid per-signature were more likely to commit fraud than circulators paid per-day or per-hour.  Id. at 474-75.  Thus, the court found that the law violated the First Amendment.  Id. at 470-71.

Likewise, opponents of a similar law in Maine presented evidence from their personal experience in Maine and in another state that per-signature payment prohibitions created uncertainties in the cost and length of petition circulation, increased the costs of petition circulation, required additional hires, and resulted in the collection of fewer signatures.  See On Our Terms '97 PAC, 101 F.Supp.2d 19, 22-23 (D. Me. 1999).  The State of Maine did not offer evidence that there was a higher incidence of fraud based on the per-signature method than there is with other methods.  Id. at 25.  The court held that the law was unconstitutional because it severely burdened First Amendment speech, but was not narrowly tailored to serve a compelling state interest.  Id. at 25-26.

The District Court for Idaho applied strict scrutiny analysis from Meyer when it struck down a law prohibiting per-signature payments.  Idaho Coalition United for Bears v. Cenarrusa,

15

234 F.Supp.2d 1159, 1165 (D. Idaho 2001) (quoting Idaho Code § 34-1821). Because the court found that the law chilled protected speech and did not find evidence that payment on a per-signature basis encouraged fraud, it held that the law violated the First Amendment. Id. at 1165-66.

In three later court of appeals decisions, the appeals courts accepted the evidence submitted by the respective states that the per-signature payment prohibition was necessary to ensure the integrity of the voting process. In Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614 (8th Cir. 2001), North Dakota produced evidence concerning an incident in 1994 where 17,000 petition signatures were invalidated and "a subsequent investigation revealed that payment per signature was an issue in the 1994 incident." Id. at 618. It is not clear from the decision exactly what the Ninth Circuit panel meant by the phrase "payment per signature was an issue" and it is therefore difficult to compare the quantum of evidence submitted in that case to the evidence submitted by the State of Ohio here. Perhaps more importantly, the court found in Jaeger, unlike here, that the plaintiffs had offered only bare assertions, and not evidence, that a payment per-hour scheme would burden their ability to collect signatures.

The Ninth Circuit likewise upheld the Oregon per-signature payment prohibition, but again the evidence submitted in that case was of a different quality than the evidence submitted here. Prete v. Bradbury, 438 F.3d 949, 961-62 (9th Cir. 2006). The Prete court found that the law imposed only a lesser burden on free speech, and Oregon had an "important regulatory interest in preventing fraud and its appearances in its electoral processes." Id. at 969-71. It accepted Oregon's evidence that some signature gatherers paid per-signature had engaged in fraud. Id. at 970. But it rejected the plaintiff's claims that per-signature payment prohibition

decreased the pool of circulators, made it more difficult to qualify initiative or referendum measures for the ballot, and resulted in a significant decrease in the number of valid signatures obtained. Id. at 963-64.

The Ninth Circuit discounted testimony from the plaintiffs' witnesses, including William Arno and Tracy Taylor, that professional petitioner circulators would not be interested in circulating petitions in Oregon after the per-signature payment prohibition passed because the Arno and Taylor could not testify that the circulators would work in Oregon in the absence of the prohibition. Id. at 964. No witness in Prete testified that he or she would have worked in Oregon in the absence of the prohibition. Plaintiffs here presented stronger evidence. Tracy Taylor testified that the top coordinators he had used for prior Ohio initiatives refused to work in Ohio on an hourly pay basis. (Taylor Dep. at 53.) Taylor's testimony is boosted by that of Gena Ranger who stated that she would not work in Ohio, where she had worked before, for hourly pay. (Ranger Decl. ¶ 5.)

The plaintiffs' case in Prete also was hurt when the Ninth Circuit credited the testimony of a professor who stated that the limited available evidence suggested that circulators paid by the hour obtained a higher validity rate than those paid per-signature. Id. at 966. The State of Ohio offers no evidence that circulators paid per-hour would have similar success in Ohio and the difference in the initiative procedures in the two states cautions against using the Oregon experience as a predictor of what would happen in Ohio. Even the Prete court noted that the Oregon law did "not prohibit adjusting salaries or paying bonuses according to validity rates or productivity." Id. at 968.

Finally, and most recently, in a short decision issued under time constraints, the Second

Circuit held consistent with Jaeger and Prete that a prohibition on per-signature payment "does not impose unduly burdensome and unjustified restrictions on the payment of petition signature collectors." Person v. New York State Bd. of Elections, – F.3d –, 2006 WL 2961240, at *2 (2nd Cir. Oct. 18, 2006). The court explained its decision as follows: "[W]e find the record presented to us provides insufficient support for a claim that the ban on per-signature payment is akin to the complete prohibition on paying petition circulators that was deemed unconstitutional in Meyer, or that the alternative methods of payment it leaves available are insufficient." Id. However, the opinion is so lacking in legal analysis as to be of little persuasive authority.

In sum, the Court is satisfied that this case, based on the evidence submitted, is more analogous to the District Court decisions in which similar per-signature prohibitions were struck down than to the Circuit Court of Appeals decisions where such prohibitions were upheld. CTR has established with evidence that the Ohio Statute would burden the core political speech of initiative proponents by making it more difficult to retain circulators to communicate their political message, thus limiting the size of the audience it can reach and making it less likely that they will gather the number of signatures needed to place an initiative on the ballot. See Meyer, 486 U.S. at 423. Conversely, while the State of Ohio's evidence might show that fraud has occurred when the payment per-signature method is used, it has not isolated the form of payment as being the cause of or an incentive to widespread petition signature fraud in Ohio. As such, the Court finds that O.R.C. § 3599.111 is unconstitutional.

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is **GRANTED** against the State of Ohio and the State of Ohio's Motion for Summary Judgment is **DENIED**.

### III. CONCLUSION

The Court hereby **GRANTS** the Motions for Summary Judgment filed by Defendants Joseph T. Deters and Mathias H. Heck, Jr. (docs. 32, 24.)  The Court hereby further **GRANTS** Plaintiffs' Motion for Summary Judgment (doc. 29) against the State of Ohio, **DENIES** the State of Ohio's Motion for Summary Judgment (doc. 33), declares that the O.R.C. § 3599.111 is unconstitutional, and enjoins its enforcement.

IT IS SO ORDERED.

    s/Susan J. Dlott
Susan J. Dlott
United States District Judge